**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 22-cr-231 (JMC) |
| v. | |
| MICHAEL THOMAS PRUDEN, | |
| Defendant. | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION**
**TESTIMONY**

Defendant Michael Thomas Pruden moves to suppress the Government's use of testimony related to five photo-array identifications as evidence in Pruden's upcoming jury trial. The Government opposes. Because one of the Government's proffered identifications crossed the line into impermissible suggestivity and lacked sufficient reliability, the Court **GRANTS** the motion as to that identification, but **DENIES** the motion as to the other four identifications.[1]

**BACKGROUND**

The Parties are familiar with the facts of this case, but briefly, Pruden is charged with five counts of assault and two counts of impersonating a federal officer for allegedly assaulting five men in Washington, D.C.'s Meridian Hill Park. ECF 30. The assaults occurred on five separate occasions between 2018 and 2021, each after nightfall. *Id.* In each assault, Pruden allegedly approached the men with a flashlight, gave police-style commands, and sprayed them with a chemical irritant. *Id.* ¶ 4. Meridian Hill Park is federal land, and the U.S. Park Police investigated

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

the incidents. *Id.* ¶ 1; *see* ECF 60 at 2. During the course of their investigation, Park Police officers showed the five complainants—referred to by their initials as J.D., N.S., C.W., E.B., and D.S.—photo arrays that included Pruden's photograph. ECF 60 at 2-3. Each of the men identified Pruden as his assailant. *Id.* at 3. Pruden challenges all five of these identifications as impermissibly suggestive in violation of the Due Process Clause and moves that they be suppressed.

## DISCUSSION

The Due Process Clause, as interpreted by longstanding Supreme Court precedent, prohibits the Government from introducing as evidence testimony of a pre-trial photographic identification procedure only if the procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The D.C. Circuit applies a two-step test for this assessment. First, a court must ask "whether the identification procedure was impermissibly suggestive." *United States v. Kelsey*, 917 F.3d 740, 749 (D.C. Cir. 2019) (citation omitted). Courts assess suggestivity based on factors including "the size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Cooper*, 85 F. Supp. 2d 1, 36 (D.D.C. 2000) (citation omitted). If the identification procedure was not unduly suggestive based on those and similar factors, the inquiry ends and any "questions concerning [the identification's] reliability go to the weight of the evidence, not its admissibility." *Id.* (citation omitted).

If, however, a court finds that the identification procedure was impermissibly suggestive, it proceeds to the second question: whether, "under the totality of the circumstances, the identification was nonetheless sufficiently reliable to preclude a very substantial likelihood of irreparable misidentification." *Kelsey*, 917 F.3d at 749–50 (citation omitted). The "key factors" that courts assess at this step are "the opportunity of the witness to view the [suspect] at the time

of the crime, the witnesses' degree of attention, the accuracy of [the witnesses'] prior description of the [suspect], the level of certainty demonstrated at the [identification], and the time between the crime and the [identification]." *Id.* (citation omitted). The court must weigh the identification's reliability "against the corrupting effect of the suggestive identification itself." *Id.* at 750 (citation omitted). Identifications will be suppressed only when the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (citation omitted).

At the first step, Pruden argues that all five photo identifications were impermissibly suggestive because (a) the number of photos used in the array shown to the witnesses, six, was too small; (b) the officers administering the five arrays did not use double-blind procedures; (c) differences in the photos' background color made the suspect's photo stand out, ECF 80 at 3; (d) Pruden's photo was the only one in the array shown to all five witnesses which had the "distinctive characteristic" of a resemblance to the actor Tyler Perry, ECF 50 at 3–4; (e) the primary officer who administered the photo arrays told one of the witnesses (D.S.) that he "ha[d] a suspect" before showing the witness the array, ECF 68 at 5; (f) that same officer later suggested to D.S. that the witness's identification was correct and did not caution him against telling others about his identification, ECF 83 at 31:11–34:18; and (g) the administering officer failed to video-record any of the five identification procedures (despite the fact that doing so is best practice), suggesting that the officer may have engaged in suggestive practices similar to those uncovered with respect to D.S.'s identification, Hr'g Rough Tr. 41:18–43:20 (Sept. 13, 2024). For its part, the Government argues that concerns (a) and (b) do not support a finding of impermissible suggestivity under the caselaw, ECF 60 at 8–12; that (c) is irrelevant because the witnesses did not describe the suspect as resembling Tyler Perry until after the photo array was created, ECF 84 at 2

n.1; and that the written instructions that the administering officer provided to all five witnesses prior to their identifications cured any other potential suggestivity arising from the officer's statements during the array administrations, ECF 60 at 12–13.

### 1.  The Identifications of Witnesses J.D., N.S., C.W., and E.B. Are Admissible.

For four of the five witnesses, the Government has the better of the argument. First, while some courts in other circuits have found use of an array of only six photos to "weigh heavily" toward suggestivity, *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994), the D.C. Circuit has held that six photos in an array is "not impermissibly suggestive," *United States v. Gantt*, 617 F.2d 831, 840-41 (1980), *abrogated on other grounds by In re Sealed Case*, 99 F.3d 1175 (D.C. Cir. 1996). *See also Cooper*, 85 F. Supp. 2d at 36 (holding that a six-photo array was not "unduly suggestive"). Second, as to double-blind procedures, Pruden cites no D.C. Circuit caselaw—or even on-point caselaw from another circuit—holding that failure to use a double-blind photo identification procedure violates the Due Process Clause, even if it is a best practice. *See* ECF 83 at 57:16–58:1; Hr'g Rough Tr. at 33:24–34:11 (Sept. 13, 2024) (two other Park Police officers describing double-blind identification procedures as best practice); *see also Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) (describing double-blind as the "preferred . . . method" for photo identifications). Third, although the Court agrees that the background of the suspect's photo is lighter than that of the five filler photos, the difference is not so stark as to warrant suppression on its own.

As to the Tyler Perry resemblance, even assuming that this resemblance is indeed a "distinctive characteristic" of Pruden's, it has no relevance to this inquiry because no witness had provided this description to Park Police before they created the array. *See United States v. Rattler*, 475 F.3d 408, 413 (D.C. Cir. 2007) (discussing the importance of the photos in the array matching

"significant features *described by the witnesses*" (emphasis added)). Finally, although the lack of any video recording creates a "risk that erroneous (or coerced) eyewitness identifications go undetected," the record does not contain any actual evidence, beyond some suppositions, of improperly suggestive administration methods as to four of the witnesses. *Hart*, 798 F.3d at 588. Nor does Pruden offer more than a suggestion, without record evidence, that the witnesses may have communicated with one another about their identifications between making them. Without more, the Court does not find those four photo identifications crossed the line, murky though it may be under the governing test, into constitutionally impermissible suggestivity.

### 2. The Identification of Witness D.S. Is Inadmissible.

The identification procedure used with witness D.S., however, crossed the line. Unlike the other four identifications, the administration of this identification was recorded in writing because D.S. is hearing impaired and the administering officer did not know sign language or bring a sign language interpreter. ECF 82 at 33:17–34:8. That written record raises significant concerns. Most glaring was the administering officer's statement, immediately prior to D.S.'s identification, that "I have a suspect" and then, immediately after that, "I need you to look at pictures." ECF 68 at 5. In context, these statements strongly suggested to D.S. that one of the photos in the array depicted the suspect. As the Supreme Court has long recognized, the "chance of misidentification" is "heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons*, 390 U.S. at 383; *see also Grubbs v. Hannigan*, 928 F.2d 1483, 1490 (10th Cir. 1993) ("[S]uch coaching has long been recognized by the courts as an important factor in determining whether a pre-trial lineup was impermissibly suggestive.").

To be sure, the U.S. Park Police's standard written instruction—which Park Police instructs its officers to give to witnesses in writing on a sheet that accompanies the array—that "[t]he police

are in no way implying that the subject responsible for the offense is included within the photographs" could help to reduce the suggestivity of the officer's statement. ECF 60 at 3, 12–13. However, the caselaw does not support the Government's strident argument that written instructions "[p]reclude[] [a]ny [p]ossibility of [s]uggestiveness," *id.* at 12, only that such instructions may "mitigate" the risk, *United States v. Saunders*, 501 F.3d 384, 391 (4th Cir. 2007). Further, it is unclear whether the administering officer ever asked D.S. to read the written instructions, since the officer's notes purportedly recorded everything the two said to one another during the array administration and nowhere did the notes instruct D.S. to read the form or read it carefully. *See* ECF 82 at 37:15–38:13.

The officer's suggestive statement thus heightens the other deficiencies in the array composition and identification, such as the difference in background color and the lack of double-blind administration, which do not support suppression on their own but become more relevant when taken together. The Court also finds discrepancies between the administering officer's statements and those of his two testifying former colleagues about the feasibility of double-blind procedures, video recording, and other array administration best practices: the administering officer testified that those best practices were infeasible in all five of these identifications, whereas his two former colleagues testified that they regularly used such practices. Moreover, D.S. later stated that he was shown only five photos in the array and was never shown one of the filler photos, calling into further question the extent to which the administering officer followed the script and complied with baseline requirements. Govt. Ex. 13 at 3. And the administering officer's failure to bring an American Sign Language interpreter to the array administration—despite his colleagues apparently having done so in subsequent interviews with D.S., *see id.* at 1, 3—further decreases the likelihood that the officer effectively and thoroughly communicated with D.S. during the

identification procedure. Overall, the weight of the evidence in the record points toward impermissible suggestivity in D.S.'s identification.

Finding impermissible suggestivity in D.S.'s identification only, the Court proceeds to the second step: reliability. And the totality of the circumstances renders D.S.'s identification unreliable. First, although D.S. later stated in a follow-up police interview that he saw Pruden in Meridian Hill Park several times before making his identification, those viewings appear to have all been at night. *Id.* at 1; *see* ECF 50 at 5; ECF 60 at 14. In contrast, the caselaw frequently cites "daylight" viewing as an important indicium of reliability. *See, e.g.*, *Kelsey*, 917 F.3d at 750; *Rattler*, 475 F.3d at 414 ("good lighting conditions"); *Neil v. Biggers*, 409 U.S. 188, 200 (1972) (citing viewing in "adequate artificial light" on at least one occasion). Second, those viewings occurred at least one to two years before D.S.'s identification, Govt. Ex. 13 at 1, 3, a time lag significantly longer than what the Supreme Court has called "a seriously negative factor" weighing against reliability, *Neil*, 409 U.S. at 201 (referring to a "lapse of seven months"). *See also United States v. Greene*, 704 F.3d 298, 309 (4th Cir. 2013) (finding that a lapse of 17 months between crime and identification "weighs against the reliability of the testimony").

To be sure, the fact that D.S.'s identification was consistent with those of four other witnesses could be interpreted as bolstering its reliability. So, too, could what D.S. described in a follow-up police interview as the certainty of his identification. *See* Govt. Ex. 13 (saying, according to officer's interview notes, that he immediately identified Pruden in the array and "didn't have to think about it"). But the impermissible suggestivity of the array administration weakens the force of those facts. The certainty D.S. expressed in an interview conducted months after the array may well have derived from the suggestive statements the officer made both before and after the identification—or from the somewhat suggestive features of the array's composition.

In short, weighing the identification's reliability "against the corrupting effect of the suggestive identification itself," *Kelsey*, 917 F.3d at 750, D.S.'s identification does not hold up.

As the Supreme Court recently reaffirmed, "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 565 U.S. at 241. Here, the Park Police's conduct in eliciting D.S.'s identification was improper. To admit it against Pruden, despite the serious degree of suggestivity and problems with the identification's reliability, would "violate[] fundamental conceptions of justice." *Id*. at 237.

## CONCLUSION

Pruden's motion is therefore **GRANTED** as to D.S.'s identification and **DENIED** as to the other four witnesses' identifications.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: September 19, 2024